Filed 12/31/20  P. v. Ros CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OUTHDORM ROS,<br><br>    Defendant and Appellant. | D076616<br><br><br><br>(Super. Ct. No. SCD279952) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Matthew C. Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

The information charged defendant Outhdorm Ros with making a criminal threat that would result in death or great bodily injury to Jacqueline F. (Pen. Code,[1] § 422, count 1); and possessing a controlled substance (methamphetamine) (Health & Saf. Code, § 11377, subd. (a), count 2). The information further alleged that in the commission of count 1, defendant personally used a dangerous weapon (knife) (§§ 1192.7, subd. (c)(23) & 12022, subd. (b)(1)); that he previously had been convicted of a strike which was also a serious felony; and that he had served prior prison terms. (§§ 667, subd. (a)(1) & 667.5, subd. (b).)

The jury found defendant guilty of both counts, and found true the two enhancements attached to count 1. The court sentenced defendant to prison for 11 years, based on the upper term of three years on count 1, doubled to six years due to the strike prior, plus five years for the prior serious felony; and to a concurrent term on count 2, a misdemeanor. Also at sentencing the court found defendant had no ability to pay any fines, fees, or assessments.

Defendant on appeal contends the court erred in admitting video evidence from a police officer's body-worn camera taken at the time of his arrest. In the video, defendant volunteered he was "gonna remain silent" and knew his "*Miranda*[2] rights" *before* officers had apprised defendant of those rights. Defendant contends the court's admission of this evidence for the limited purpose of allowing the jury to evaluate his mental state at the time of the offenses violated his constitutional rights under the Fifth and Fourteenth Amendments. As we explain, we disagree with defendant's contention and affirm his judgment.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

# FACTUAL OVERVIEW

Jacqueline testified that at about 6:30 a.m. on December 30, 2018, she went to a laundromat located on University Avenue in San Diego. Jacqueline was familiar with the laundromat, as she typically did her laundry there about every two weeks. She estimated there were about six other people inside the laundromat, including a laundromat employee.

As Jacqueline walked outside to retrieve laundry detergent from her car, she saw a man she later identified as defendant across the parking lot, walking behind another man. As she headed back into the laundromat, Jacqueline noticed the man walking in her direction. This was the first time Jacqueline had ever seen this man.

About 30 seconds later, the man entered the laundromat. Jacqueline could hear the man mumbling to himself. She watched as the man got into one of the dryers located about six feet from where she was standing, and closed the door "completely." About a minute later, the man exited the dryer, and sat on a bench about four feet away from Jacqueline. The man next stood up, and, holding a cigarette in his hand, loudly asked if anyone minded if he smoked a cigarette. Nobody responded.

Jacqueline went to the "card machine" near the rear of the building to load up her laundry card and to get away from the man, as he made her uncomfortable. About 30 seconds later, the man approached the card machine and asked another customer for a lighter. Because she believed the man was following her, Jacqueline stopped what she was doing and went back to the washing machines. About a minute later, the man again approached. Jacqueline for a second time headed back to the card machine to "get away from him." As she walked, the man followed behind her at a distance of about six feet. Jacqueline became fearful.

3

Jaqueline's concern about the man grew as he followed her for a third time back to the washing machines. She decided to notify police on the nonemergency line. She went outside, retrieved her cellphone from her car, and went back into the laundromat as she attempted to report the incident. While on her cellphone, the man came within about two feet of her.

Jacqueline testified that from the corner of her eye she saw the man look directly at her and in an angry tone say, " 'Don't lie to me or I'll slit your throat and rob you and everybody.' " The man repeated he was going to "slit [her] throat," and added he was going to "kill" her. Jacqueline interpreted the man's statements as threatening.

Jacqueline testified when the man made these statements, he did not "look out of the ordinary," and made them "as if it's a normal thing that he would say." Scared, Jacqueline remained on her cellphone. Right after the man spoke, the laundromat employee from across the room yelled, "Hey, leave her alone," which distracted the man. Jacqueline used the opportunity to exit the laundromat. An operator on the nonemergency line stated an officer was en route.

Once back inside the laundromat, another man Jacqueline recognized as a regular customer asked if she was okay. She testified: "And I told him yes, it's just somebody following me around. He's, like, 'No. I'm asking you because he [i.e., the man] has knives in his hand.' " Once Jacqueline learned the man had knives in his possession, she went back outside and called 911. While on the phone with dispatch, police arrived.

4

Jacqueline gave a statement to police just minutes after the incident. Her statement was recorded by an officer's body-worn camera and played for the jury. A transcript of the statement is included in the record.

Michelle R. testified she was working at the laundromat when the incident occurred. Michelle called 911 to report the incident, explaining: "Because there was a man. He was saying he was going to go cut off our necks. And at one point he got really close to a customer, and he had a box cutter and a pocketknife. And I just felt that she could be in harm's way. So I called the police."

Michelle stated when the man first entered the laundromat, he was talking loudly to himself about his family, how they thought he was a failure, and then he started saying he "was going to cut [their] necks." After making this statement, the man approached a customer (i.e., Jacqueline), got "right next [to her]," and, as noted, Michelle saw the man was holding an "orange box cutter and a pocketknife," one in each hand. Michelle saw the knife's blade was exposed, and recognized it was the knife from the laundromat office. Scared and concerned for herself and her customers, and after other customers implored her to call police, Michelle reported the incident. As she was making the call the man was yelling at customers to "shut the fuck up."[3]

---

[3] The manager of the laundromat testified that surveillance cameras were located both inside and outside the laundromat on the day of the December 30 incident; that the cameras record 24-hours a day, seven-days a week; and that the footage is stored on the system for three weeks until it begins to record anew over the old footage. The manager further testified the police's request for the video of the incident came too late, as it already had been "overwr[itten]" by a new recording.

Officer Daniel Almond of the San Diego Police Department responded to the incident at about 6:57 a.m., within about two minutes of receiving the dispatch of a suspect displaying a knife. Officer Almond was the first officer on the scene. Inside the laundromat he contacted an individual matching the description of the suspect. Officer Almond at trial identified the suspect as defendant.

Officer Almond saw the suspect drop "something" on a counter after Officer Almond identified himself. The suspect complied with Officer Almond's commands to get on the ground and put his hands behind his back, allowing the officer to handcuff the suspect. Once backup arrived, Officer Almond inspected the items dropped by the suspect and found a flashlight, a folding knife in the collapsed position, an earring, and a white crystalline substance in a small bag.[4]

Officer Almond testified the suspect then appeared "coherent"; was able to follow "instructions"; was not saying anything "unintelligible"; and was having what he described as "gaseous movements." Officer Almond activated his body-worn camera. The video was played for the jury, and a transcript was included in the record.

The transcript from the video describes the initial contact; the suspect following Officer Almond's commands; and the suspect telling Officer Almond he was about to "fart" "for real," then apologizing and saying, "ohhhhh" while laughing. Officer Almond and the suspect then had the following exchange:

Suspect: "Hey, I'm gonna remain silent right now. I know my rights are gonna be read, but I said today, I'm gonna invoke my rights now.

Officer Almond: "Your what?

---

[4] The record shows the parties stipulated that the substance found by Officer Almond next to the knife was .62 grams of methamphetamine.

Suspect: "I said my *Miranda* rights uh being read to me and told me, and as you say it to me, I'm gonna remain silent right now.

Officer Almond: "Okay. [¶] You got any other weapons on you? You got any other weapons on you?

Suspect: "(Farts)[.]

Officer Almond: "Cool. [¶] This way. [¶] Stay on your side."

After his arrest, the suspect was transported to the hospital for evaluation of "altered mental status," as the suspect on arrest became "nonverbal" as if he was asleep. Emergency room doctor Valerie Norton, M.D. examined the suspect.

Based on her consultation notes, Dr. Norton testified, "when I approached [the suspect] and talked to him gently, he opens his eyes and begins talking to me like a normal person. He denies any complaints whatsoever, and states he is not sick in any way. He was able to answer all of review of systems questions normally, and is fully oriented times four. He states, 'I love everyone.' " She explained to the jury that oriented "times four" meant the suspect was oriented to himself, the person; to the place where he was; and to the date and the events that were happening.

After finding his medical examination to be "normal," Dr. Norton made the following diagnosis of the suspect: "I considered a differential diagnosis of malingering with the police by 'playing possum,' which I think is the most likely thing, versus drug or alcohol intoxication which may also be playing a part. He is clearly back to normal here. I think he had clear secondary gain to avoid going to jail. However, for me he appears 100 percent medically clear, except for likely psychiatric illness which may have been causing his violent behavior. Regardless, his behavior is more appropriate for arrest and incarceration rather than a psychiatric evaluation here in our hospital . . . .

He is not espousing any suicidality or homicidality currently, and I feel he is clear for booking and discharge[] in the custody of the police."

Dr. Norton did recommend that the suspect undergo a psychiatric evaluation at the jail. She also did not test the suspect to determine whether he was under the influence of drugs, as he denied using alcohol or illicit drugs. Dr. Norton opined that a person under the influence of methamphetamine would still be able to "make goal-oriented decisions," "be aware of [his or her] thoughts," but also capable of acting violently.

The defense called clinical and forensic psychologist Clark Clipson, Ph.D. Dr. Clipson testified that he tested and evaluated defendant about six months after the incident. In connection with that evaluation, Dr. Clipson reviewed some of the police reports of the incident, and defendant's hospital records when he was taken for evaluation postarrest. However, Dr. Clipson neither reviewed the footage of the incident from Officer Almond's body-worn camera, nor his police report.

From this information, Dr. Clipson opined defendant suffered from a "stimulant use disorder of the amphetamine-type substance." Dr. Clipson added: "I think it's a severe disorder. And the only reason that he's not using now is because he's in a controlled environment. I also believe that he has an amphetamine-induced psychotic disorder that—at onset during intoxication. And, finally, I believe he has antisocial personality disorder." Dr. Clipson recognized that this was the first time defendant had been diagnosed with such disorders; and that a person who uses methamphetamine can become violent without being in a psychotic state.

Dr. Clipson further testified that with a stimulant-use disorder, a person can experience "psychotic symptoms" such as "hallucinations," "delusions," and "erratic, bizarre, disorganized behaviors" not unlike a person with schizophrenia; and that even after defendant stopped using drugs, he continued to demonstrate such symptoms and psychotic thinking.

Based on a hypothetical that corresponded with the witness testimony summarized *ante*, Dr. Clipson opined defendant's behavior during the incident had all the "classic features" of someone experiencing a "amphetamine-induced psychotic disorder." He explained: "You have an altered mental state. You have confusion. You have hyperactivity and agitation, and you also have the presence of psychosis." Dr. Clipson noted psychosis in such circumstances usually included hallucination, evidenced by someone talking to himself in response to "internal stimuli."

In rebuttal, Christine Padilla testified she was working as the intake nurse at the San Diego County jail when defendant was being booked. Relying on the intake records kept at the jail, she testified defendant then was "alert," "cooperative," and "responding to [her]." Defendant on intake also denied taking any drugs, including "heroin, cocaine, or methamphetamine"; and denied ever being diagnosed with mental illness or hearing voices or seeing "things that are not there." Ms. Padilla further testified defendant never requested a psychological evaluation, nor was one performed on him, while housed at the jail.

DISCUSSION

Defendant contends the admission of his statements invoking his right to remain silent were irrelevant and unduly prejudicial,[5] and violated his Fifth Amendment right to silence and his right to assistance of counsel, made applicable to the states through the Fourteenth Amendment. (See *Carter v. Kentucky* (1981) 450 U.S. 288, 305 [noting the "freedom of a defendant in a criminal trial to remain silent 'unless he chooses to speak in the unfettered exercise of his own will' is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth"].)

A. *Additional Background*

The defense in limine moved to exclude defendant's statements that he was invoking his right to remain silent, arguing the admission of such statements violated his constitutional rights. The defense primarily relied on *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) and its progeny. The defense claimed the admission of such statements penalized defendant for exercising his right to remain silent, guaranteed under the Fifth Amendment as

---

[5] The People on appeal do not argue that defendant forfeited this particular claim of evidentiary error by failing to raise it in the trial court. (See Evid. Code, § 353 [providing in part that a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; see also *People v. Williams* (1997) 16 Cal.4th 153, 209 (*Williams*) [failure to make an objection to evidence at trial forfeits any claim of error on appeal].) We note from the record that defense counsel admitted during argument that defendant's uncoerced statements invoking his right to remain silent were likely probative on the issue of his mental state. And, from our own thorough review of the record, we have not found any claim by the defense that such statements were unduly prejudicial. (See generally Evid. Code, § 352; *Williams*, at p. 209.) In any event, we exercise our discretion and reach the merits of this issue.

10

interpreted by *Miranda*. The record shows the court heard argument on whether to exclude such statements, commenting "there might be a legitimate interest in admitting them to show [defendant's] state of mind," "awareness," and his "ability to reason." The court deferred ruling on the defense's motion.

The following day, the court stated it had reviewed the footage from Officer Almond's body-worn camera. The court noted that defendant's statements of " 'I am invoking my right not to talk without having even been advised of that [right] by an officer' " appeared to have been "volunteered" by defendant; and that these statements were probative on the issue of whether defendant could act rationally.

The prosecutor argued defendant made these statements before he was given *Miranda* warnings. The prosecutor described defendant's statements as nothing more than a "simple utterance . . . that shows exactly what he's thinking, that he's aware of everything that's happening around him," and that he is "in control of his mind." The prosecutor argued the statements were not admissible to show defendant's guilt, nor would she ever make such an argument.

The prosecutor continued: "And it's very crucial in a case like this. For a human being that's going to argue essentially at the end of this case that he was under a stimulant use disorder, methamphetamine-induced psychosis, he really snapped out of it very quickly when the police officers came. His statements are highly relevant in that regard."

After hearing additional argument, the court denied the defense's motion. In so doing, the court noted it had reread *Doyle*, explaining: "*Doyle* is predicated on the notion that it's . . . unfair to tell a person you have the right to remain silent and penalize him for exercising that right. Therefore, I

11

think *Doyle* applies only to invocation after advisal and not before. What we're dealing with here are volunteered statements. There was no *Miranda* advisal beforehand. And I think that they are certainly relevant to show that this man, frankly, was able to form the specific intent to do what he did in the Laundromat which is going to be his defense that he couldn't form that specific intent." The court stated it would give a jury instruction providing defendant's voluntary decision to invoke his right to remain silent could not be used to support the inference "he's hiding something" or "he's guilty."

The court during jury instructions gave CALCRIM No. 303 as follows: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other purpose." The court then gave jurors a "specific reminder as to that right now," further instructing the jury: "You have heard evidence that the defendant, Mr. Ros, invoked his right to remain silent to Officer Almond. Every individual has the right to remain silent and to request an attorney. You are not to use his invocation of this right against him as any evidence of his guilt. He's not trying to hide anything. You can't use it for that purpose. You may only use that evidence to evaluate Mr. Ros's intent and/or mental state."

The court also gave CALCRIM No. 355, telling the jury: "We talked about this as well, didn't we, when we first met. A defendant—and here that's Mr. Ros—has an absolute constitutional right not to testify. He may rely on the state of the evidence and then argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that Mr. Ros did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

During closing, the prosecutor argued that if defendant was in a psychotic state and delusional, one would have expected defendant to act that

12

way when police arrived, which was about two minutes after the incident; and that on contact with Officer Almond, defendant instead was able to follow directions and was oriented, as demonstrated when he turned his back on the officer, dropped the incriminating items, including the methamphetamine and knife, with its blade now closed, then turned and faced the officer.

The prosecutor then addressed defendant's invocation of the right to remain silent: "He says, 'I'm going to remain silent right now. I know my rights are going to be read, but I said today I'm invok[ing] my rights right now.' 'Your what?' 'I said my *Miranda* rights being read to me and told me. And as you say to me, I'm going to remain silent right now.' 'Okay.'

"First and foremost, I will never ever argue that his invocation of his rights show that he's guilty in any way because he invokes them. Every individual in [the] United States has that right, and that's not what you are allowed to use it for. The judge has told you numerous times. I'm going to tell you.

"This is what you can use it for. Without being asked, this individual, Mr. Ros, who's apparently going through a hallucination, has thought of his *Miranda* rights himself. He has. This isn't a case where he's being asked, 'Do you want to remain silent? These are your rights.' If that was the case, we would have never read it to you or told you about this, but he's thought of them himself. He realized, remember, that that's an option you have when you get arrested. He knows those are rights that he has. And he says, you know what, I'm going to invoke them. This is the thought process in his head without being asked. Who does he tell them to, though? An officer. . . . He knows he's being arrested, and he knows he's speaking to an officer now."

B. *Guiding Principles and Analysis*

1. <u>Evidentiary Error</u>

Only relevant evidence is admissible. (Evid. Code, § 350.) "Relevant evidence" is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.* at § 210.) " 'The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' " to establish material facts . . . .' " (*People v. Heard* (2003) 31 Cal.4th 946, 973 (*Heard*).) "The trial court has broad discretion in determining the relevance of evidence." (*Ibid.*) "We review for abuse of discretion a trial court's rulings on the admissibility of evidence." (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

Even if relevant, evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A "trial court has broad discretion under [Evidence Code] section 352 to assess whether the probative value of evidence is outweighed by the risk of undue prejudice, consumption of time or confusion." (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 (*Ogle*).) "We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. [Citations.]' " (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Here, the defense maintained defendant lacked the specific intent to be convicted in count 1 of making a criminal threat resulting in death or great bodily injury. To establish a criminal threat under section 422, the prosecution was required to prove: (1) the defendant willfully threatened to

commit a crime causing death or great bodily injury to the victim; (2) the threat was made with the *specific intent* that it be taken as a threat—even absent intent to carry out the threat; (3) the threat " 'was, "on its face and under the circumstances . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat" ' " (see *In re George T.* (2004) 33 Cal.4th 620, 630); (4) the threat caused the victim " ' "to be in sustained fear for his or her own safety or for his or her immediate family's safety" ' " (*ibid.*); and (5) under the circumstances, the fear was reasonable. (*Ibid.*)

The evidence of a defendant's specific intent " 'is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.] . . . . 'We "must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence. [Citations.]" ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Turning to the instant case, the evidence shows when defendant initially entered the laundromat shortly after it opened at 6:30 a.m., he engaged in what can only be described as odd behavior by climbing into a dryer located near the washing machines Jacqueline was using, "completely" closing the door, and sitting inside for about a minute, only then to crawl out of the dryer and sit on a bench about four feet away from Jacqueline. The record further shows that Jacqueline attempted to avoid defendant, including making any eye contact, by walking to the "card machine" in the back of the laundromat; that defendant followed her to the card machine, and, when she again sought to avoid him by returning to the washers at the front of the laundromat, he again followed her; and that this pattern repeated itself at least two more times. Defendant's behavior scared Jacqueline, to the point

15

she went and retrieved her cellphone from her car, and called the nonemergency police number to report the incident.

The record also shows Jacqueline went back inside the laundromat while attempting to contact police. Defendant came within a few feet of her, and, while holding a box cutter and a knife with an exposed blade, threatened to "kill" her, and "slit" her throat and "rob" her, while also threatening to rob other customers. It was then that Jacqueline called 911. Defendant's behavior was of such concern that other customers inside the laundromat implored laundromat employee Michelle to notify police. Michelle did so after she saw defendant come within two feet of Jacqueline while holding a box cutter and knife with an exposed blade.

As noted, the defense's main contention at trial was that defendant lacked the specific intent to commit the offense in count 1 because, according to Dr. Clipson, defendant on the morning of the incident was likely suffering from a severe "stimulant use disorder of the amphetamine-type substance," as evidenced by defendant mumbling to himself both outside and inside the laundromat; crawling into the dryer; loudly requesting to smoke a cigarette once inside the laundromat; possessing .62 grams of methamphetamine; following Jacqueline around the laundromat; and finally, threatening to kill and rob her, and also threatening the other laundromat customers.

In light of this background, we conclude the trial court properly exercised its broad discretion when it ruled to admit defendant's voluntary statements—made within a matter of minutes after the incident—that he was invoking his right to remain silent. (See *Heard*, *supra*, 31 Cal.4th at p. 973.) As the trial court repeatedly noted, as provided by the jury instructions, and as acknowledged by the prosecutor during closing, these statements were admissible not to show defendant was guilty, but *only* for

16

the limited purpose of allowing the jury to evaluate his intent and mental state in connection with count 1. We thus reject defendant's contention the court erred in finding defendant's invocation relevant under Evidence Code section 350.

We further conclude the court did not err in admitting these statements under Evidence Code section 352. As noted, the statements were fleeting, as summarized *ante*, and were voluntarily made by defendant during his arrest, *before* he received *Miranda* warnings. In addition, as also noted they were admitted only for the limited purpose of allowing the jury to evaluate defendant's mental state at the time of the incident, as defendant made the statements within minutes of its conclusion. And, in light of the other video footage from Officer Almond's body-worn camera and the witness testimony, the statements' probative value were not substantially outweighed by the risk of undue prejudice, consumption of time, or confusion. (See *Ogle*, *supra*, 185 Cal.App.4th at p. 1145.)

We now turn to main issue in this case: whether the admission of these statements by defendant violated his constitutional rights.

2. <u>Constitutional Error</u>

Defendant contends the court's admission of his right to remain silent prior to receiving *Miranda* warnings violated his constitutional rights under the Fifth and Fourteenth Amendments because his invocation was allegedly "used by the prosecution to persuade the jury [defendant] was guilty." To support this argument, defendant relies on *Griffin v. California* (1965) 380 U.S. .609 (*Griffin*) and *Doyle* among other cases.

*Griffin* and *Doyle* were cases in which the prosecution sought to take unfair advantage of the defendant's silence. In *Griffin*, a pre-*Miranda* case, the Court held due process and the privilege against self-incrimination

17

prohibited the court and the prosecution from commenting on the defendant's failure to testify on his own behalf.  (*Griffin*, *supra*, 380 U.S. at pp. 613–614 [rejecting what it called the "comment rule" because the refusal to testify was a "remnant of the 'inquisitorial system of criminal justice' " outlawed by the Fifth Amendment].)

In *Doyle,* the case more applicable to our situation, the court held due process prohibited the use of a defendant's silence at the time of arrest, after he had received *Miranda* warnings, to impeach an affirmative defense raised for the first time by the defendant at trial.  (See *Doyle*, *supra*, 426 U.S. at p. 618 [noting that, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings," and further noting that "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial"].)

*Griffin* and *Doyle* stand for the principle that it is fundamentally unfair for a government to afford defendants the right to remain silent and then use that silence against them.  But that is not our situation here.  Therefore, we conclude neither *Doyle* nor its progeny applies in the instant case.

First, unlike the defendant in *Doyle*, in the instant case our defendant did not testify at trial, and thus his statements invoking his right to remain silent did not "impeach an explanation subsequently offered at trial."  (See *Doyle*, *supra*, 426 U.S. at p. 618.)

Second and more important, also unlike the situation in *Doyle* our defendant invoked his right to remain silent *before* police had advised him of his *Miranda* rights.  (See *Anderson v. Charles* (1980) 447 U.S. 404, 408 (*Anderson*) [noting "*Doyle* bars the use against a criminal defendant of silence

maintained *after* receipt of *governmental* assurances" (italics added)].)  Thus, the instant case is not one in which the government gave a defendant *Miranda* warnings, the defendant, as a result, was thereby induced by such governmental action to remain silent, and his or her postarrest silence was later unfairly used against him or her at trial.  (See *Jenkins v. Anderson* (1980) 447 U.S. 231 239–240 (*Jenkins*) [noting that *Miranda* "compel[led]" the result in *Doyle* and that *Doyle* was inapplicable to the use of prearrest silence to impeach a defendant's credibility when "*no governmental* action induced petitioner to remain silent before arrest," the "failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings," and "[c]onsequently, the fundamental unfairness present in *Doyle* is not present" (italics added)].)

Third, in contrast to *Doyle* and despite defendant's argument to the contrary, the record unambiguously shows the invocation of his right to remain silent was not admitted to prove guilt.  Instead, defendant's statements were admitted solely to allow the jury to evaluate intent and his mental state in connection with count 1.  Indeed, as shown by the jury instructions, the court's admonitions, and the prosecutor's closing argument, all summarized *ante*, the jury was repeatedly told it could only use defendant's invocation for this limited purpose, and not to show defendant was "hiding something" or was guilty.

The record also shows defendant's mental state was the primary issue at trial.  As noted, the defense's theory at trial was defendant was acting under an amphetamine-induced psychosis at the time of the offenses, and thus, lacked the capacity to make a criminal threat under section 422.  The record further shows the jury heard conflicting evidence on this issue.  As the prosecutor explained and as we have found, defendant's invocation was

19

probative on whether he had the requisite specific intent to commit the offense in count 1.  (See *People v. Austin* (1994) 23 Cal.App.4th 1596, 1611–1612 [recognizing while it is fundamentally unfair for the state to afford a defendant the right to remain silent, and then use that silence against him or her, a defendant's right to remain silent cannot be used "to cut off the prosecution's 'fair response' to the evidence or argument of the defendant"], overruled on another ground as stated in *People v. Palmer* (2001) 24 Cal.4th 856, 861.)

In addition to *Doyle*, defendant also relies on *Wainwright v. Greenfield* (1986) 474 U.S. 284 (*Wainwright*), claiming the case "provides clear guidance for the instant case."  We disagree.

Unlike the situation here, law enforcement in *Wainwright* gave the defendant three *Miranda* warnings shortly after his arrest, and each time the defendant invoked his right to remain silent.  Relying on *Doyle*, the *Wainwright* Court held the prosecutor's use of the defendant's postarrest, post-*Miranda* warnings silence as evidence of his sanity to rebut his plea of not guilty by reason of insanity violated his due process rights under the Fourteenth Amendment.  (*Wainwright*, *supra*, 474 U.S. at p. 292.)

The *Wainwright* Court noted the "unfairness" in *Doyle*, and in the case before it, was based on the "implicit assurance contained in the *Miranda* warnings 'that silence will carry no penalty.' " (*Wainwright*, *supra*, 474 U.S. at p. 290.)  The *Wainwright* court continued:  "The critical importance of the implied promise that is conveyed to an arrested person by the *Miranda* warnings has been repeatedly confirmed in subsequent decisions.  Thus, in *Fletcher v. Weir,* 455 U.S. 603, 606 (1982) [(*Fletcher*)], we explained:

" 'In *Jenkins . . . .,* as in other post-*Doyle* cases, we have consistently explained *Doyle* as a case where the *government* had induced silence by

20

implicitly assuring the defendant that his silence would not be used against him. In *Roberts v. United States,* 445 U.S. 552, 561 (1980) [(*Roberts*)], we observed that the postconviction, presentencing silence of the defendant did not resemble "postarrest silence that may be induced by the assurances contained in *Miranda* warnings." In *Jenkins,* we noted that the failure to speak involved in that case occurred before the defendant was taken into custody and was given his *Miranda* warnings, commenting that *no governmental action* induced the defendant to remain silent before his arrest. 447 U.S. at 239–240. Finally, in *Anderson . . .,* we explained that use of silence for impeachment was fundamentally unfair in *Doyle* because "*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of *governmental assurances*." '

"Since *Fletcher,* moreover, we have continued to reiterate our view that *Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' *South Dakota v. Neville,* 459 U.S. 553, 565 (1983). *Doyle* and subsequent cases have thus made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." (*Wainwright, supra,* 474 U.S. at pp. 290–291, italics added; fns. omitted.)

*Wainwright*, *Fletcher*, *Jenkins*, *Roberts*, and *Anderson* collectively teach that for *Doyle* to apply and for there be a finding of fundamental unfairness under the Due Process Clause of the Fourteenth Amendment, the use at trial of a defendant's postarrest silence must stem from *governmental* action that induces a defendant to remain silent *after* being given *Miranda* warnings. Here, as we have repeatedly noted, there was no governmental action when defendant voluntarily invoked his right to remain silent during his arrest, pre-*Miranda*. We thus conclude defendant's due process rights were not violated when the court admitted his voluntary invocation to remain silent, not to support an inference of guilt, but rather to allow the jury to consider this evidence in determining the main issue in the case: whether defendant possessed the requisite intent and mental state to support a conviction on count 1.

## DISPOSITION

The judgment is affirmed.

BENKE, Acting P.J.

WE CONCUR:

HALLER, J.

IRION, J.

22